**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOANN EDWARDS,** | : | **CIVIL ACTION NO. 1:18-CV-2398** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA HUMAN** | : | |
| **RELATIONS COMMISSION,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Plaintiff JoAnn Edwards brings claims of employment discrimination and retaliation against her former employer, defendant Pennsylvania Human Relations Commission ("Commission"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.*; and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* The Commission moves for summary judgment. For the following reasons, we will grant the Commission's motion.

## I.   Factual Background & Procedural History[1]

### A.   Edwards' Employment with the Commission

The Commission is the administrative agency primarily responsible for investigating and adjudicating alleged violations of the PHRA, which prohibits, *inter alia*, race- and sex-based employment discrimination throughout the Commonwealth.  See 43 Pa. Stat. and Cons. Stat. Ann. §§ 952, 956.  In 2011, the Commission sought to hire a new executive director to oversee the agency's day-to-day operations.  (See Doc. 78 ¶ 1).  The Commission chose Edwards, a Caucasian woman and self-identified lesbian, to replace its longtime executive director, Homer Floyd, who had held the position since the agency's inception four decades earlier.

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. Pa. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the movant's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 78, 85).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

In addition to providing responses to the Commission's statements of fact, Edwards filed a document styled as "Plaintiff's Counter Statement of Material Facts."  (See Doc. 85 at 9-29).  Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this filing, and Edwards did not request leave of court to file it. We thus decline to accord these paragraphs the evidentiary weight contemplated by Rule 56.1.  See Barber v. Subway, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (Conner, C.J.); see also Rau v. Allstate Fire & Cas. Ins. Co., 793 F. App'x 84, 87 (3d Cir. 2019) (nonprecedential) (citing with approval, *inter alia*, Barber, 131 F. Supp. 3d at 322 n.1, in holding district courts enjoy wide discretion in interpreting their local rules).  Nonetheless, we have examined the entire Rule 56 record, including plaintiff's counterstatement, in resolving the instant motion.

(See id. ¶ 2; see also Doc. 84-3, Ex. 9, Lassiter Dep. 29:12-30:4).  Then-Chairman Gerald Robinson, a straight Black man, personally offered Edwards the job.  (See Doc. 78 ¶ 2).  Dr. Raquel Yiengst, the Commission's vice chair and chair of the personnel committee, participated in the hiring decision.  (See id. ¶ 3).  Robinson was unaware of Edwards' sexual orientation when he made the offer.  (See Doc. 85 ¶ 2).

Edwards took office during a time of fiscal austerity in state government.  (See Doc. 84-3, Ex. 23).  Budget cuts necessitated significant staffing reductions at the Commission, especially among investigators, which in turn increased the workload of those who remained and contributed to a stressful atmosphere.  (See id.; see also Doc. 84-3, Ex. 2, Bolstein Dep. 24:1-8; Doc. 84-3, Ex. 1, Edwards Dep. 174:11-175:16).  Approximately one year after Edwards took office, the Commission produced a report indicating the number of cases processed by the agency was in decline, a trend that continued through 2015.  (See Doc. 78 ¶¶ 4-5).  Edwards attributes the report's results to budgetary issues beyond her control that persist in some measure to this day.  (See Doc. 85 ¶¶ 4-5).  She highlights her meetings with state legislators to obtain additional funds and her implementation of a "reengineering process with a full staff compliment" as efforts to improve the Commission and reduce its backlog of cases.  (See id. ¶¶ 5-6).  Robinson gave Edwards a positive performance review in July 2014 notwithstanding the Commission's systemic budget and case-processing issues.  (See Doc. 84-3, Ex. 10).

The latter half of Edwards' tenure was tumultuous in several respects due to her deteriorating professional relationship with Robinson; the chief counsel, Kathy

Morrison; and, to a lesser extent, Dr. Yiengst.  (See Doc. 84-3, Ex. 7, Akers Dep. 19:20-20:15).  Edwards highlights a few examples of her plight.  (See Doc. 84 at 8-9).  In May 2015, Edwards intervened in a disciplinary matter on behalf of an employee who may have been experiencing a mental health crisis and allowed him to take FMLA leave.  (See Edwards Dep. 123:23-134:12).  The commissioners held an executive session on May 18 to discuss the employee's situation.  (See Doc. 78, Ex. 8).  Edwards' decision upset Robinson and Dr. Yiengst because they wanted to terminate the employee and find a replacement right away instead of waiting six months for his leave to expire.  (See id.)  Edwards and Morrison advised the commissioners terminating an employee under those circumstances would be illegal.  (See id.)  Robinson criticized Edwards for authorizing protracted FMLA leave—which Edwards acknowledges typically is not something she would do, (see Edwards Dep. 127:5-16, 130:10-12)—and said she would be "held accountable for the lack of productivity" at the regional office where the employee in question worked, (see Doc. 78, Ex. 8).  Edwards called Christopher J. O'Neal, Director of Human Resources Delivery Centers at the Commonwealth's Office of Administration ("OA"),[2] to complain about the episode.[3]  (See Doc. 78 ¶ 28).

Edwards was not open about her sexual orientation at work for fear of being fired.  (See generally Edwards Dep. 69:10-74:25).  She went to some lengths to keep

[2] The OA functions as the Commission's human resources department pursuant to an interagency agreement.  (See Doc 78 ¶ 12).

[3] Edwards characterized the call as an effort to "just inform[ O'Neal] of what's going on over at the Commission," rather than "lodging a complaint."  (See Edwards Dep. 132:24-134:12).

her identity from Robinson because he had "talked very badly about" the Commission's former chair, a gay man, and expressed displeasure with the agency's outreach on LGBTQ issues.  (See id. at 73:22-74:13; see also Bolstein Dep. 51:22-52:20).  In December 2015, Edwards attended a holiday function with Robinson and Dr. Yiengst, during which Robinson pulled them both aside and yelled at Edwards within earshot of other guests over the inadvertent release of privileged information.  (See Edwards Dep. 116:16-117:25).  Around that time, Robinson learned Edwards was a lesbian and had married her partner the previous year.  (See Doc. 85 ¶ 2).  Robinson called Edwards at work on New Year's Eve and, with Dr. Yiengst on the line, berated Edwards, called her a liar, and compared her unfavorably to her predecessor.  (See Edwards Dep. 74:25-76:19).  Edwards told O'Neal about the call.  (See id. at 76:24-77:6).  A coworker overheard Edwards recounting the incident a few days later and told her Robinson was "treating [her] differently" because of her "sexuality," which "everybody knows about."  (See id. at 77:6-78:12).

Neither Robinson nor anyone else at the Commission made any negative comments to Edwards about her sexual orientation, (see Doc. 78 ¶ 25); however, she claims Robinson began harassing her and undercutting her authority soon after he learned of her membership in the LGBTQ community in December 2015, (see Doc. 85 ¶ 2).  For example, Robinson described Edwards' section of the office to another employee as an "all white girls club" because it comprised only Caucasian women, all of whom Edwards had hired.  (See Doc. 78 ¶ 26).  Edwards confronted Robinson about his comment during a staff meeting; he grew angry and stormed out after

saying "there's too many white people in management." (<u>See</u> Edwards Dep. 100:22-102:25). Edwards forwarded a complaint about Robinson's comment to OA in February 2016. (<u>See</u> Doc. 78 ¶ 27). Robinson contacted Edwards one day in April to criticize her for ordering Subway for the commissioners' lunch meeting and "not properly managing our budget." (<u>See</u> Doc. 84-3, Ex. 14). He accused her of misleading him and said "the frequency of the lying is increasing." (<u>See</u> <u>id.</u>) The next month, Robinson purported to give Edwards what she describes as "an openly hostile review," (<u>see</u> Doc. 85 ¶¶ 8, 19), in which he "stressed that [Edwards'] hiring practices, *i.e.* hiring predominantly white women, is backfiring" because "it is alienating staff and creating a club-like environment," (<u>see</u> Doc. 84-3, Ex. 18). Edwards lodged complaints about her treatment to other commissioners and OA, but does not believe anything was done in response to them. (<u>See</u> Doc. 85 ¶¶ 13, 15-16, 27-28).

### B.    Leadership Shakeup and Investigations

Governor Tom Wolf removed Robinson from the Commission's chairmanship in April 2016 and named Commissioner Joel Bolstein interim chair.[4] (<u>See</u> Doc. 78 ¶ 8; Doc. 85 ¶ 8). Edwards met with Bolstein following his installation and told him she was gay after he confided in her about his gay child; she asked him to keep her revelation confidential because she feared Robinson's "harassment." (<u>See</u> Edwards Dep. 135:1-2, 274:12-25). Bolstein asked Edwards to take a break from disciplining

---

[4] Edwards and the Commission agree Robinson's removal as chair rendered his subsequent "review" of her performance unofficial, hence its exclusion from her personnel file. (<u>See</u> Doc. 86 at 6, 9; Edwards Dep. 172:21-173:22).

employees for the time being due to staffing shortages and lack of funding.  (See id. at 135:1-137:13).  He then held a series of town-hall-style meetings with Commission staff to solicit feedback and concerns.  (See Doc. 78 ¶ 9).  Some employees "were in tears" describing "difficult" workplace conditions at the Commission.  (See id. ¶ 10).  Others explained Edwards had delegated "an inordinate amount of authority" to her assistant, including employee discipline and performance reviews—personnel matters typically under the executive director's purview.  (See id. ¶¶ 7, 10).  A few went so far as to advocate for Edwards' removal.  (See id. ¶ 10).

The Commission retained the services of the Vereen Group, a third-party consultant, to analyze the agency's workplace culture and develop a strategic plan for improvements.  (See id. ¶ 11).  The Vereen Group issued its final report on September 18, 2017.  (See id.)  The report enumerated several "weaknesses" among staff leadership, including its failure to model the Commission's values, the absence of unity and purpose, poor performance accountability, and the lack of internal authenticity and transparency.  (See id.)  The report also identified certain "threats" to the Commission's work, such as leadership infighting, questionable decision making, staff turnover, inequitable treatment, and a punitive work environment. (See id.)

Edwards' oversight of Morrison was a significant point of contention within the agency.  (See Doc. 85 ¶ 20; see generally Bolstein Dep. 167:12-183:20). Commissioners excluded Edwards from a few meetings they had with Morrison and complicated her efforts to discipline Morrison for performance issues.  (See Edwards Dep. 104:21-106:19).  Robinson, for instance, "upgraded" Edwards'

negative performance review of Morrison for 2015 to "satisfactory." (See Doc. 84-3, Exs. 16, 18). Bolstein, a lawyer himself, did not think it appropriate for a nonlawyer like Edwards to supervise Morrison's legal work—although the governor's office and the Office of General Counsel took "the contrary view," which Bolstein accepted. (See Bolstein Dep. 167:12-168:15). Dr. Yiengst thought Morrison was performing poorly and agreed Edwards should supervise her, but she concluded Edwards was not doing so properly because Morrison's performance did not change. (See Doc. 84-3, Ex. 15, Yiengst Dep. 48:20-50:20).

Robinson emailed Edwards on October 24, 2017, and "urg[ed]" her "to refrain from" conducting Morrison's latest performance review until Edwards received "input" from the commissioners, whom Robinson carbon copied on the email. (See Doc. 84-3, Ex. 19). Robinson reminded Edwards he rescinded her previous negative assessment of Morrison, having found it "unfair" and an inaccurate reflection of the chief counsel's work. (See id.) He also critiqued Edwards for "skirt[ing]" his inquiries about performance reviews and for summarily terminating the Commission's former press secretary and enforcement director without first informing the personnel committee. (See id.) Robinson concluded by asking Bolstein "to convene an executive session to discuss these matters and others as soon as possible." (See id.)

Edwards contends Robinson's email "contained false information" about her and "started the process of [her] termination." (See Doc. 85 ¶¶ 16, 19). She drafted a lengthy, pointed rebuttal in which she accused Robinson of violating Commonwealth policy by changing Morrison's performance review ratings, asked

him to "cease and desist stating inaccurate information" about her own performance as executive director, and said she was "tired of [him] attacking [her] professional reputation and . . . character." (See Doc. 84-3, Ex. 20). Edwards previewed the draft with O'Neal and others, but ultimately replied to the original email with a brief response after another OA representative advised her to keep it simple. (See id.; see also id., Ex. 21). A few weeks later, Morrison sent a five-page letter to Bolstein documenting various workplace problems and perceived leadership deficiencies at the Commission. (See Doc. 78 ¶ 20). Among Morrison's complaints was Edwards' delegation to her assistant of employee discipline matters outside the latter's chain of command. (See id.)[5]

For his part, O'Neal conducted a separate investigation into the Commission's workplace culture after receiving complaints from numerous employees about Edwards and individuals under her supervision. (See id. ¶¶ 13, 14). He did not interview or speak with Robinson or Dr. Yiengst as part of his investigation. (See id. ¶ 14). O'Neal reviewed Commission emails and data pertaining to employee grievances and found the agency suffered from a "toxic work environment . . . due in large part to ineffective leadership." (See id. (quoting id., Ex. A)). He specifically noted the "Executive Director does not promptly address the inappropriate behavior or poor performance of Senior Staff." (See id. (quoting id., Ex. A)). From O'Neal's perspective, "the agency was practically at war

---

[5] The last incident of hostility Edwards specifically recounts occurred in December 2017, when Robinson walked into a union negotiation session, pointed his finger at her, and "very loudly" said she needed to call Dr. Yiengst about a school district meeting. (See Edwards Dep. 122:20-123:20).

with itself." (See Doc. 84-3, O'Neal Dep. 41:10-24). He consulted with Bolstein about the Commission's future in late 2017 and advised him to replace Edwards. (See Doc. 78 ¶¶ 15-17).

### C.   Consensus and Resignation

The commissioners met in executive session in November and December 2017 to discuss how best to proceed in light of the foregoing events. (See id. ¶ 18). They excluded Edwards from these meetings. (See id. ¶ 30). Bolstein's contemporaneous notes indicate the commissioners reached a "complete consensus": they had lost confidence in Edwards' leadership and endeavored to replace her. (See id. ¶ 18 (quoting id., Exs. 3, 8)). Neither Robinson nor Dr. Yiengst voiced any concerns about Edwards' performance distinct from those of the other commissioners. (See id. ¶ 19). Bolstein scheduled a special meeting of the commissioners for January 12, 2018, the purpose of which was to give Edwards the choice to tender her resignation or to be removed in a public vote. (See id. ¶¶ 21, 22). Edwards agreed to resign that evening after speaking with Bolstein and OA representatives. (See id. ¶ 23). Each of the seven commissioners who participated in the January 12 meeting, including Robinson and Dr. Yiengst, voted to accept Edwards' resignation; two commissioners were absent. (See id. ¶ 24; see also Doc. 78-1, Ex. 7). The Commission eventually hired Chad Lassiter, a straight Black man, to replace Edwards as executive director. (See Doc. 85 ¶ 14). Lassiter subsequently requested and received Morrison's resignation. (See Lassiter Dep. 61:1-67:6).

On May 9, 2018, Edwards filed a Title VII charge with the Commission's federal counterpart, the Equal Employment Opportunity Commission ("EEOC").

(See Doc. 86 at 10).  The EEOC could not determine whether the Commission had violated federal law, so it closed its file on Edwards' claim in September 2018 and issued a right-to-sue letter.  (See Doc. 1-2).  The parties did not include a copy of the charge in the record, so its exact parameters are unclear.

### D.   Procedural History

Edwards filed her complaint in December 2018, raising claims of race and sex discrimination under the PHRA and Title VII, respectively (Counts I and II), and retaliation under both statutes and the FMLA (Counts III through V).  The Commission now moves for summary judgment on all counts.  The motion is fully briefed and ripe for disposition.

## II.   <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>See</u> <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action

proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Edwards bases her claims on two conceptually distinct adverse employment

actions. The first and more concrete is Edwards' compulsory resignation as

executive director, which is common to each of her five claims. (See Doc. 84 at 6-

17). The second is the Commission's alleged failure to adequately address

Robinson's antagonistic behavior toward her, which she claims created a hostile

work environment. (See id. at 17-25). Edwards seeks to hold the Commission liable

for Robinson's conduct in this regard pursuant to the doctrine of *respondeat*

*superior*. (See id. at 22-25). For ease of analysis, we address Edwards' claims

collectively based upon the alleged theory of recovery animating each count.

### A.    Termination (Counts I Through V)

Title VII and the PHRA prohibit an employer from discharging an individual

because of her race or sex.[6] See 42 U.S.C. § 2000e-2(a)(1); 43 PA. STAT. AND CONS.

STAT. ANN. § 955(a). Both statutes and the FMLA also forbid retaliating against an

employee for opposing certain unlawful employment practices. See 42 U.S.C.

---

[6] We review PHRA claims under the same standards as Title VII claims. See Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)). The Supreme Court of the United States has clarified Title VII's longstanding prohibitions against sex discrimination include discrimination on the basis of an employee's sexual orientation or gender identity. See Bostock v. Clayton County, 590 U.S. ___, 140 S. Ct. 1731, 1741-42, 1754 (2020).

§ 2000e-3(a); 29 U.S.C. § 2615; 43 PA. STAT. AND CONS. STAT. ANN.§ 955(d).[7]  Courts

analyze discrimination and retaliation claims using the burden-shifting framework

outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the first step of

which requires the plaintiff to establish her *prima facie* case. See McDonnell

Douglas, 411 U.S. at 802.

   A plaintiff makes out a *prima facie* case of discrimination under Title VII by

presenting sufficient evidence (1) she is a member of a protected class, (2) she was

qualified for her position, (3) she suffered an adverse employment action, and

(4) the circumstances of the adverse action give rise to an inference of

discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing

McDonnell Douglas, 411 U.S. at 802).  Retaliation claims require a similar threshold

showing.  A plaintiff alleging retaliation under Title VII or the FMLA generally

must establish (1) she engaged in a statutorily protected activity, (2) she suffered an

adverse employment action, and (3) there was a causal connection between her

---

[7] Our court of appeals generally applies the same analytical framework to PHRA retaliation claims as to Title VII retaliation claims.  See Connelly, 809 F.3d at 791 n.9 (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).  The FMLA does not expressly mention "retaliation."  See Egan v. Del. River Port Auth., 851 F.3d 263, 270 & n.3 (3d Cir. 2017).  By its plain terms, however, Section 2615 of the act makes it unlawful, *inter alia*, "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" subchapter I of the act or because that individual "has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to" the same. See 29 U.S.C. § 2615(a)(2), (b)(1).  Our court of appeals has not considered whether either provision may be satisfied under the circumstances presented in the matter *sub judice*.  Nonetheless, we will assume Edwards facially met the requirements of at least one of the provisions by opposing calls to fire the employee who had taken FMLA leave in 2015 and by reporting the incident to O'Neal, the agency's *de facto* human relations director.  See *supra* pp. 3-4.  The Commission does not contest Edwards' FMLA retaliation claim in this regard.  (See Doc. 79 at 16).

protected activity and the adverse employment action.  See Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)); Capps v. Mondelez Global, LLC, 847 F.3d 144, 152 n.6 (3d Cir. 2017) (citing Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its adverse employment decision.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802).  The defendant's burden at this rebuttal stage is "'relatively light'"; it is a burden of production only.  See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006)).  Assuming the employer meets its burden, the plaintiff then must show by a preponderance of the evidence the employer's stated reasons were mere pretext for discrimination.  See Fuentes, 32 F.3d at 763.

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000) (quoting Fuentes, 32 F.3d at 764).  The plaintiff may call attention to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons."  See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 764).  "[P]roof of a discriminatory

atmosphere may be relevant in proving pretext" because it contextualizes an employer's decisionmaking process.  See Creely v. Genesis Health Ventures, Inc., 184 F. App'x 197, 200 (3d Cir. 2006) (nonprecedential) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 546 (3d Cir. 1992)).  But we accord little weight to "stray remarks by non-decisionmakers," especially if those remarks are made "temporally remote from the date of decision."  See Ezold, 983 F.2d at 545 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

The Commission concedes Edwards has established a *prima facie* case of race and sex discrimination for purposes of the instant motion.  (See Doc. 79 at 6).  The Commission proffers what it claims is a legitimate, nondiscriminatory reason for requesting Edwards' resignation—the commissioners' loss of confidence in her ability to lead the agency—which she supposedly cannot overcome.  (See id.)  Setting that argument aside, the Commission's principal defense is Edwards' purported failure to show a majority of commissioners acted with discriminatory animus when they unanimously voted to discharge her.  (See id. at 7-8 (citing LaVerdure v. County of Montgomery, 324 F.3d 123, 125 (3d Cir. 2003); Watson v. Borough of Susquehanna, 532 F. App'x 233, 236-37 (3d Cir. 2013) (nonprecedential))).  The Commission considers that numerical proof necessary to demonstrate a "causal nexus" between Edwards' protected characteristics and the agency's adverse employment decision.  (See id. at 6-8).  At best, the Commission allows, Edwards has identified discriminatory motives held by Robinson, leaving her three commissioners short of any hope of relief.  (See id. at 8-9).  Edwards offers no competing argument or contradictory authority in her favor on this issue.

Courts address causation at different stages of the McDonnell Douglas framework depending on the claim under review.  The framework expressly looks for proof of causation at the *prima facie* stage when assessing retaliation claims.  See Carvalho-Grevious, 851 F.3d at 257; Capps, 847 F.3d at 152 n.6.  For discrimination claims, evidence of causation might be analyzed at the threshold stage or when considering a plaintiff's pretextual rebuttal.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) (recognizing possibility of "conflat[ing] the test for causation under the *prima facie* case with that for pretext" as "inherent in the nature of the two questions being asked").  Proof of causation is an essential aspect of a plaintiff's case no matter the stage at which we consider it.

The Commission's causation argument is quite novel.  To reiterate: the agency contends Edwards cannot prove discriminatory or retaliatory animus was a but-for cause of her termination absent evidence four of the seven commissioners who voted to accept her resignation did so because of her race, sex, or statutorily protected complaints.  (See Doc. 78 at 7-9).  Our court of appeals has not had occasion to delineate the causation standard in cases against multimember decisionmaking bodies under Title VII or the FMLA, though it has done so in other contexts.  See, e.g., LaVerdure, 324 F.3d at 125 (county not liable to terminated employee under 42 U.S.C. § 1983 for disparaging remarks made by chairman of three-member board of commissioners, who cannot make policy acting alone); Watson, 532 F. App'x at 236 (citing LaVerdure, 324 F.3d at 125-26) (fired police officer could not prove First Amendment retaliation claim when only one of six borough councilors voted to terminate with impermissible motives).

Courts beyond the Third Circuit have taken similar approaches to lawsuits against multimember decisionmaking bodies in a variety of contexts, including Title VII. See, e.g., Russell v. Univ. of Tex. of Permian Basin, 234 F. App'x 195, 202-04 (5th Cir. 2007) (per curiam) (nonprecedential) (plaintiff could not prove university's six-member hiring committee violated Title VII when it unanimously recommended alternative applicant); Jackson v. Lowndes Cnty. Sch. Dist., 126 F. Supp. 3d 772, 782-84 (N.D. Miss. 2015) (evidence allegedly biased board member may have influenced another's nay vote in 3-2 adverse-employment decision enough to defeat summary judgment in race discrimination case); Kuivila v. City of Newton Falls, No. 4:14-CV-1593, 2016 WL 541478, at *14-15 (N.D. Ohio Feb. 11, 2016) (granting summary judgment for want of evidence more than one councilmember voted to terminate chief of police because he complained of sexual harassment).  Some courts demand proof a majority of the body's voting members held improper motives.  See Griggs v. Chickasaw County, 930 F.3d 696, 704 (5th Cir. 2019); Campbell v. Rainbow City, 434 F.3d 1306, 1313 (11th Cir. 2006); cf. Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1239 (9th Cir. 1994) (despite "deplorable comments" of one councilwoman, no evidence "council as a whole took . . . action with discriminatory intent").  Others require plaintiffs to show only that the allegedly biased votes "suppl[ied] the deciding margin."  See Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 262-63 (6th Cir. 2006).  Still more eschew "overly mechanistic" numerical bright-lines altogether and scrutinize whether "a significant bloc" of decisionmakers harbored bad motives coupled with "the probable complicity of others."  See Scott-Harris v. City of Fall River, 134 F.3d 427,

438 (1st Cir. 1997), rev'd on other grounds sub nom. Bogan v. Scott-Harris, 523 U.S. 44 (1998); see also Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 786 (2d Cir. 2007) (evidence "strongly indicat[ing] discrimination was a significant reason for a public body's action" sufficient if defendant "fails to counter" with proof majority "acted with permissible motives").

We need not choose among these approaches.  Edwards has not demonstrated improper motives drove a majority of votes, provided the decisive margin, or tainted a significant bloc of commissioners.  Seven commissioners voted in concert to accept Edwards' resignation on January 12, 2018.  (See Doc. 78 ¶ 24). She has proffered evidence just one of those seven, Robinson, may have been motivated to replace her because of her race or sex or in retaliation for complaints she lodged against him.  (See, e.g., Doc. 78 ¶ 26; Doc. 85 ¶¶ 8, 19).  She presents no evidence from which a factfinder reasonably could infer any other commissioner harbored similar motives.  Even assuming Robinson voted with discriminatory or retaliatory intent, he did not supply the deciding vote, nor is there any evidence his alleged motives tainted anyone else's decision.  (See Doc. 78 ¶¶ 18-19).  To the contrary, the record is replete with evidence that the primary motivations for the commissioners' decision was Edwards' inappropriate delegation of personnel matters to her subordinate and her contributions to a toxic work environment. (See, e.g., id. ¶¶ 7-11, 13-17, 20).  Only Robinson overtly referenced Edwards' race and gender pejoratively, (see id. ¶ 26), and she concedes no one commented negatively on her sexual orientation, (see Edwards Dep. 85:3-11, 263:12-15). Edwards' race- and sex-based discrimination and retaliation claims fail because

there is no genuine issue of material fact as to whether her statutorily protected traits or complaints about Robinson's conduct caused the commissioners to seek and unanimously accept her resignation.

The same is true of Edwards' FMLA retaliation claim. Edwards, at best, can show two commissioners, Robinson and Dr. Yiengst, were upset about her decision to grant an employee FMLA leave in May 2015 and suggested a course of action (firing the employee) that likely would have been unlawful had it come to fruition. (See Doc. 78, Ex. 8.) But she has proffered no evidence suggesting the isolated incident or her informal grievance to O'Neal motivated them or any other commissioner to terminate her. Indeed, such a motive is belied by the fact Morrison expressly cited the FMLA in voicing her opposition at the same meeting and faced no repercussions. (See id.) Edwards also cannot reasonably rely upon that lone dustup to infer impropriety given the two-and-a-half-year gap between the meeting and her termination. See Krouse, 126 F.3d at 503-04 (19-month gap between employee's EEOC charge and placement on workers' compensation leave too attenuated to infer retaliatory motive). Accordingly, we will grant summary judgment to the Commission on Counts III, IV, and V in full and on Counts I and II to the extent they rely upon Edwards' termination as a predicate adverse act.

### B.    Hostile Work Environment (Counts I and II)

Edwards also alleges Robinson created a hostile work environment. (See Doc. 84 at 17-25). Hostile work environment claims are not similarly susceptible to the foregoing analysis because employers may be held liable for the discriminatory conduct of supervisors under Title VII. See Meritor Sav. Bank, FSB v. Vinson,

477 U.S. 57, 70-73 (1986) (recognizing hostile work environment claims and vicarious employer liability for sex discrimination under Title VII).  The Commission does not dispute that then-Chairman Robinson was Edwards' direct supervisor.  (See Doc. 84 at 24).

To prevail on a hostile work environment claim, a plaintiff must prove (1) she suffered intentional discrimination due to a protected trait or activity, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would have detrimentally affected a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability.  See Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007); Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  The first four elements establish the existence of a hostile work environment; the fifth determines the basis on which to hold the employer liable.  See Huston v. Procter & Gamble Paper Prods. Corp., 586 F.3d 100, 104 (3d Cir. 2009).

Moreover, federal law requires would-be plaintiffs seeking redress for alleged discrimination to exhaust all administrative remedies before pursuing relief in federal court.  See Watson v. Eastman Kodak Co., 235 F.3d 852, 854 (3d Cir. 2000).  A complainant must file a charge of discrimination with the EEOC within 180 days of an allegedly unlawful employment practice, or within 300 days if she files a similar charge with a parallel state agency such as the Commission.  See 42 U.S.C. § 2000e-5(e)(1); Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165-66 (3d Cir. 2013).  Discrete acts of discrimination "are not actionable" if a plaintiff does not timely

allege them in a filed charge.  See Mandel, 706 F.3d at 165 (quoting Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).  Each discrete act "constitutes

a separate actionable unlawful employment practice."  Id.  However, plaintiffs may

"aggregate" discriminatory acts that are not by themselves individually actionable

under the "continuing violation doctrine."  See id. (citing O'Connor v. City of

Newark, 440 F.3d 125, 127 (3d Cir. 2006)).  Aggregation often is necessary to

demonstrate a hostile work environment, which, by its nature, is "composed of a

series of separate acts that collectively constitute one 'unlawful employment

practice'" and "cannot be said to occur on any particular day."  See id. (quoting

Morgan, 536 U.S. at 115-17).  "Such acts 'can occur at any time so long as they are

linked in a pattern of actions which continues into the applicable limitations

period."  Id. (quoting O'Connor, 440 F.3d at 127); see West v. Phila. Elec. Co.,

45 F.3d 744, 754-55 (3d Cir. 1995) (requiring proof at least one act occurred within

filing period and explaining harassment is "more than the occurrence of isolated or

sporadic acts of intentional discrimination").

The Commission argues Edwards delayed lodging her EEOC charge until

May 2018—more than 300 days past the last arguably actionable adverse

employment action—and thus her claim is time barred.  (See Doc. 86 at 10-11).  To

that end, the agency catalogues the discrete episodes Edwards recounts in

furtherance of her claim, including two incidents in December 2015 (at the holiday

event and the call on New Year's Eve); one in April 2016 (the Subway dispute); one

in May 2016 (her unofficial performance review); and one in October 2017

(Robinson's email about Morrison).  (See id. at 10).  We think it appropriate to add

Robinson's "all white girls club" comment and staff-meeting contretemps in January 2016 to that list. <u>See</u> *supra* pp. 5-6. The Commission contests the severity of some of these incidents and questions their relevance to Edwards' protected traits. (<u>See</u> Doc. 86 at 7-11). In particular, the Commission disputes Edwards' attempt to characterize Robinson's October 24, 2017 email as a continuation of his allegedly discriminatory conduct. (<u>See</u> <u>id.</u> at 10-11). If that incident falls away, they argue, then her claim fails because no other episode occurred within *700* days of her EEOC charge, let alone 300. (<u>See</u> <u>id.</u> at 11). We agree.

Edwards identifies a few instances in which Robinson demonstrated ill feelings about LGBTQ issues and individuals, which made her anxious about how he might react if he knew she was a lesbian. (<u>See</u> Edwards Dep. 69:10-74:25; Bolstein Dep. 51:22-52:20). His treatment of Edwards ostensibly took a turn around December 2015, when he discovered she married her partner. (<u>See</u> Doc. 85 ¶ 2; <u>see also</u> Edwards Dep. 74:25-78:12). He occasionally raised his voice at Edwards in front of staff and strangers, and called her a liar out of the blue. (<u>See, e.g.,</u> Edwards Dep. 74:25-76:19, 116:16-117:25). The race of employees Edwards hired also was on Robinson's mind: he pejoratively referenced Edward's "all white girls club" on several occasions in early 2016 through interoffice communications, at staff meetings, and in his unofficial performance review of Edwards that May. (<u>See</u> Doc. 78 ¶ 26; Edwards Dep. 100:22-102:25; Doc. 84-3, Ex. 18). Viewing the evidence in the light most favorable to Edwards, as we are required to do, a reasonable jury could conclude that Robinson exhibited a degree of hostility toward her, attributable to her race or sex, and that his antagonism pervaded their working relationship. <u>See</u>

<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (requiring proof of conduct "severe or pervasive enough to create an objectively hostile work environment").

Robinson's hostilities ceased, however, soon after his removal as chair, when he no longer had supervisory authority over Edwards.  (<u>See</u> Doc. 78 ¶ 8).  She identifies no instances between June 2016 and January 2018 in which Robinson alluded to her race or sex or criticized her as a liar with vague allusions to some hidden "truth" she kept from him.  To be sure, viewing the record in the light most favorable to Edwards, Robinson's rude demeanor *vis-à-vis* Edwards reemerged on at least two occasions in late 2017, in his October 24 email about Morrison and at the December union meeting when he told her to call Dr. Yiengst.  (<u>See</u> Doc. 84-3, Ex. 19; Edwards Dep. 122:20-123:20).  At worst though these were "isolated or sporadic" incidents of discourtesy, different in both kind (severity) and degree (pervasiveness) from what Edwards experienced a year-and-a-half earlier.  <u>See West</u>, 45 F.3d at 754-55.  Neither rose to the level of a "tangible employment action," which the Supreme Court has defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>See Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 724, 761 (1998).  And Edwards has not shown either episode "adversely affected" her "status as an employee," <u>see</u> 42 U.S.C. § 2000e-2(a), or "interfere[d] with [her] work performance," <u>see Harris</u>, 510 U.S. at 168.  Robinson could not unilaterally control Edwards' work at that point, and he was not alone in expressing unease with Edward's ongoing oversight of Morrison.  (<u>See</u> Bolstein Dep. 167:12-168:15; Yiengst Dep. 48:20-50:20).

No reasonable factfinder could consider the events in late 2017 "plausibly or sufficiently related" to an earlier pattern of harassment extending back continuously for two years.  <u>See</u> <u>Morgan</u>, 536 U.S. at 114.  We are thus constrained to exclude both episodes from the remaining conduct comprising Edwards' hostile work environment claim, none of which falls within the 300-day lookback period. <u>See</u> 42 U.S.C. § 2000e-5(e)(1).  The most recent alleged example of Robinson's hostility, his unofficial review of Edwards' performance, happened in May 2016, nearly two years (about 700 days) before she filed a Title VII charge with the EEOC. (<u>See</u> Doc. 86 at 10; Doc. 1-2).  Edwards may not rely upon Robinson's pre-2017 conduct as the foundation for her hostile work environment claims because she did not exhaust her administrative remedies by timely filing a charge invoking the same.  <u>See</u> <u>Mandel</u>, 706 F.3d at 163-64.  Nor can she sustain her claims solely on the two incidents immediately preceding her termination.  Although isolated incidents might suffice to establish a hostile work environment in some circumstances, <u>see</u> <u>Castleberry v. STI Grp.</u>, 863 F.3d 259, 263-66 (3d Cir. 2017) (collecting cases involving "extreme isolated act[s]"), Robinson's innocuous, albeit rude behavior in October and December 2017 was not severe enough to constitute actionable harassment.  For these reasons, the Commission is entitled to summary judgment on Counts I and II in their entirety.

**IV.**    <u>**Conclusion**</u>

We will grant the Commission's motion for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     February 10, 2023